IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 22, 2010

## JOHNNY LEE LEWIS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Putnam County**
**No. 01-0401B      David Patterson, Judge**

**No. M2009-01471-CCA-R3-PC - Filed November 12, 2010**

Following a jury trial, the Petitioner, Johnny Lee Lewis, was convicted of two counts of facilitation of second degree murder, a Class B felony, and one count of aggravated arson, a Class A felony. See Tenn. Code Ann. §§ 39-11-403, -13-210, -14-302. This Court affirmed his convictions on direct appeal. See State v. Johnny Lee Lewis, No. M2002-01350-CCA-R3-CD, 2003 WL 22398394 (Tenn. Crim. App., Nashville, Oct. 21, 2003). The Petitioner filed a timely petition for post-conviction relief. Following an evidentiary hearing, the post-conviction court denied relief. In this appeal, the Petitioner contends that the post-conviction court erred in denying him relief because: (1) trial counsel failed to request that the jury be sequestered; (2) trial counsel failed to interview and present witnesses; (3) trial counsel failed to object, based on Apprendi v. New Jersey, 530 U.S. 466 (2000), to the use of enhancement factors during the Petitioner's sentencing hearing; (4) trial counsel failed to object, based on the Confrontation Clause, to testimony regarding a co-conspirator's statements; and (5) the cumulative effect of trial counsel's errors denied him a fair trial. After our review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Johnny Lee Lewis, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William E. Gibson, District Attorney General; and Lisa Zavagiannis, District Attorney General, Tennessee, for the appellee, State of Tennessee.

## OPINION

## Factual Background

In the early morning hours of July 30, 1999, Diane Watts, her ten-year-old daughter Jessica Watts, and Jessica Watts' thirteen-year-old friend Chelsie Smith, were murdered at Diane Watts' house in McMinnville. Each victim was beaten with a baseball bat and/or a torque wrench. Diane Watts died from the injuries she sustained in the assault. The two girls were alive, but unconscious, after the attack; however, they died from smoke inhalation after someone set fire to the house.

In May 2000, a Warren County grand jury issued an indictment with the following seven counts:

1. Doug Myers and the [Petitioner] for the first degree murder of Diane Watts;
2. Doug Myers and the [Petitioner] for the first degree murder of Jessica Watts;
3. Doug Myers and the [Petitioner] for the first degree murder of Chelsie Smith;
4. Doug Myers and the [Petitioner] for the felony murder of Jessica Watts;
5. Doug Myers and the [Petitioner] for the felony murder of Chelsie Smith;
6. Doug Myers and the [Petitioner] for aggravated arson; and
7. Clementine Myers and Gary Myers for criminal responsibility of first degree murder.

State v. Johnny Lee Lewis, No. M2002-01350-CCA-R3-CD, 2003 WL 22398394, at *1 (Tenn. Crim. App., Nashville, Oct. 21, 2003).

## Trial

The trial court granted the Petitioner's motion to sever his trial from that of his co-defendants. The trial court also granted the Petitioner's request for a change of venue. In his direct appeal, this Court summarized testimony at the Petitioner's trial as follows:

The [Petitioner], Johnny Lee Lewis, testified he was at the victim's residence from around midnight on July 29, 1999. His testimony at trial pegged his departure between 4:00 to 4:30 a.m. His claimed time of departure the morning of July 30 varied in his pre-trial statements from 4:00 to 5:15. The [Petitioner] said he had gone to visit the victim, at her request, to discuss information she intended to divulge to authorities concerning criminal activities of the Myers family, including drug dealing, stolen property, and alleged fraud involving Gary Myers' bankruptcy and social security application. The victim had expressed her intention to reveal this information on July 30, 1999.

The victim, Diane Watts, lived at the residence at 246 Myers Lane in McMinnville with her daughter, Jessica, and a co-defendant, Doug Myers. The other victim, Chelsie Smith, was an overnight guest of Jessica's. A business owner near the Watts' residence testified he reported the fire to 9-1-1 at 5:37[a.m.]. The log at the fire station noted a report of the fire at 5:45 [a.m.].

The responding firemen suppressed the remaining flames. The bodies of Diane Watts and her daughter were found in the rear bedroom. Chelsie Smith's body was in another bedroom. All three victims['] bodies were removed from the residence. A baseball bat and a torque wrench were found in the house and sent for lab analysis. Subsequent investigation and analysis of samples revealed that gasoline had been poured in a "Y" pattern from both bedrooms extending down the hallway, where it was ignited. A pocket knife, Old Timer brand, was found outside the residence. Diane Watts' purse was found inside, and it contained $1113.

Gary Myers, a co-defendant, testified that he had suffered a burglary at his home in June of 1999. Among the items taken was a lockbox, which was later recovered, in a damaged condition, by a third party. Law enforcement returned it to Gary Myers. The lockbox was given to Doug Myers in the company of Donnie Myers, another brother, and Raymond Hicks, son of Doug Myers. The [Petitioner] admitted in one of his statements that he and Doug Myers put the damaged box under the deck at Diane Watt's [sic] residence prior to July 29th. He further stated they took precautions to prevent their fingerprints from being placed on the box. The significance of these actions involving the lockbox are not entirely clear from the record, other than the implication that the victim was considered a suspect by Clementine Myers of being the burglary culprit. In this light, the clandestine placement might serve as a setup of the victim.

Vicky Fleming, sister of the victim Diane Watts, was at the victim's house on Wednesday preceding the murders. Ms. Fleming overheard Clementine Myers, a co-defendant and the mother of Doug, Donnie, [and] Gary Myers, in a phone conversation. Clementine stated that a "bunch" from Grundy County were coming to take care of those who burglarized Gary's home. According to Clementine, this only cost $5000, and she could get rid of anybody. She also stated that "they" knew the whereabouts of the victim Diane Watts, her daughter Jessica, and other family members at all times.

James Allen Holt testified that the [Petitioner] told him on the day before the fire and homicides that he had been watching a house that night. The [Petitioner] further stated, "There's a bitch we're going to burn out."

Jeff Mabe called the [Petitioner] on the morning of the fire. The [Petitioner] told Mabe he had been at the victim's residence about 4:30 or 5:00 a.m. A few days later, the two men discussed the deaths of the victims. The [Petitioner] stated that had he been there, he would have had to stop Doug before he hurt the children.

Shirley Humphrey was married to Doug Myers, but the [Petitioner] lived with her. Ms. Humphrey was told by the [Petitioner], prior to the murders, that the victim Diane Watts was "stepping on toes" and making some people mad. During the week before the murders, she overheard the [Petitioner] talking with Doug Myers on the telephone. The [Petitioner] said that an unnamed "she" needed to be got rid of, but to make sure the little girl was not there. The [Petitioner] told Ms. Humphrey that Clementine Myers wanted something done to "shut the victim's mouth."

The week prior to July 30, the [Petitioner] had purchased several containers of gas. These containers were in his truck on July 29. After the homicides had occurred, the [Petitioner] told Ms. Humphrey that the victim was supposed to have been killed the night of July 28 or 29, due to the daughter being absent. The [Petitioner] stated that his job had been to go in and clean up the crime scene. He was also concerned over the loss of his knife either at the victim's residence or in a vehicle. On the Saturday following the day of the homicides, the [Petitioner] instructed Ms. Humphrey to burn some items of clothing, being a pair of pants, t-shirt, shirt, and pair of shoes. She followed his directions.

During the week following July 30, Ms. Humphrey drove the [Petitioner] to Winchester where he met Doug Myers at a department store. The [Petitioner] returned with $900 that he claimed came from Clementine Myers, but was $500 short.

Kevin Lawrence, the fire chief of McMinnville, was involved in seizing a vehicle from the [Petitioner] on August 2, 1999. The [Petitioner] inquired whether an Old Time[r] pocketknife was in the vehicle.

-4-

David Campbell, a fire consultant, was called by the State as a witness. Mr. Campbell estimated that the fire in the crime scene burned from its inception, through its various stages, until it was extinguished for a total of one hour and fifteen minutes, plus or minus fifteen minutes.

Telephone records of the [Petitioner's] cell phone revealed calls to Clementine Myers' residence on the morning of July 30, 1999, at 5:45, 6:04, and 6:05.

Marilyn Myers, Gary's wife, testified that she and Gary were at the home of his mother, Clementine Myers, on either July 30 or the following day. The [Petitioner] was there, seated in the den. Clementine Myers was in the kitchen counting $100 bills and wearing "rubber gloves like doctors wear." Clementine Myers stated "this will be the last damn money that the son of a bitch gets." Marilyn Myers had never known of the [Petitioner] to visit at Clementine Myers' home.

Id. at *2-4.

At his trial, the Petitioner presented the testimony of twenty-six witnesses, in addition to his own testimony. Much of the testimony concerned Doug Myers' history of violence and statements he had made about Diane Watts.

Teresa Pelham, Doug Myers' ex-wife, testified that Doug Myers had a bad temper and had abused her when they were married. Moreover, the jury heard testimony from a 911 operator that, in the early hours of April 14, 1999, Diane Watts reported domestic violence by her boyfriend, Doug Myers. The Petitioner also presented testimony from three police officers who responded to the call—Robert Spangler, Charles Taylor, and Jason Craighead. They testified that Ms. Watts reported that Doug Myers had choked her, assaulted her, vandalized her property, and smashed all of the windows of her vehicle. The officers testified that Doug Myers admitted to abusing Ms. Watts and breaking her car windows. They also testified that Doug Myers said that he originally intended on killing Ms. Watts, but then changed his mind and decided to go rob someone. The officers testified that they apprehended him before he robbed anyone that day.

Joshua Adams testified that he heard Doug Myers, Gary Myers, and Roger Smith say before the murders that they were going to "burn out" the people who had broken into Gary Myers' house. Further, Diana Ross, a friend of Diane Watts, testified that Doug Myers told her that he was going to kill Diane Watts or have someone do it for him.

Jimmy Bonner, Clementine Myer's neighbor, testified that about a week after the murders, he overheard a conversation between Doug and Gary Myers, in which Gary Myers said, "Doug, you might as well go ahead and admit that you done this. . . . [The District Attorney] has got evidence. He has got pictures and everything." He said that Doug Myers replied, "I don't give a damn what [the District Attorney] has got on me. . . . You all are not blaming this on me."

The Petitioner also presented his own fire consultant, Stuart Bain, who testified that his investigation led him to conclude that the fire lasted twenty-five minutes, plus or minus five minutes. He also testified that two gallons or less of accelerant was used.

On September 7, 2001, after a nine-day trial, a Putnam County jury convicted the Petitioner of two counts of facilitation of second degree murder (one count relating to victim Jessica Watts and one count relating to victim Chelsie Smith) and one count of aggravated arson.

On each count of facilitation of second degree murder, the Petitioner was sentenced as a Range II, multiple offender to twenty years in the Department of Correction. For the aggravated arson conviction, he was sentenced as a Range I, standard, violent offender to twenty-five years at 100%. The trial court ordered that each of the Petitioner's sentences be served consecutively, resulting in an effective sentence of sixty-five years.

On October 21, 2003, in his direct appeal, this Court affirmed the Petitioner's convictions and the sentences imposed by the trial court. See id. at *1.

Post-Conviction Proceeding

The Petitioner filed a timely petition for post-conviction relief on August 30, 2004. The Petitioner's post-conviction hearing was held on June 5, 2009.[1] During the hearing, the Petitioner contended that: (1) trial counsel failed to present witnesses at trial; (2) trial counsel did not request the jury to be sequestered; (3) his Sixth Amendment right to confront witnesses was violated because the trial court allowed testimony of alleged co-conspirator statements; and (4) his right to a jury trial was violated when the trial court enhanced his sentence based on facts that had not been decided by a jury.

---

[1] The reason for the almost five-year delay between the filing of the petition and the hearing is not entirely clear from the record, although there is a mention that, at some point, the original post-conviction judge became ill. The first filing in the record subsequent to the petition was on March 21, 2007, when the Petitioner filed a "Motion for Determination of Status of Case."

The Petitioner's trial counsel, ("Trial Counsel") testified that he had been practicing law since October 1974. He said that, over the years, he had worked on twenty-five to thirty murder cases, and about ten or twelve of those were death penalty cases. He testified that he was appointed to represent the Petitioner at trial because the State originally pursued the death penalty on this case. Trial Counsel stated, as such, that the Petitioner's defense had many resources at its disposal, including a private investigator, a mitigation specialist, and an arson investigator. He testified that Ronald Lax acted as the private investigator for the defense, and he described Mr. Lax as one of the best investigators in the country. Trial Counsel testified that the Petitioner "spent an extensive amount of time with me and Mr. Lax, together and separately."

Trial Counsel conceded that impeaching the testimony of Gary Myers and Shirley Humphrey would have been good for the defense at trial. However, he testified, "Every name that [the Petitioner] gave me or Mr. Lax . . . we searched for diligently and discussed and investigated thoroughly." He later elaborated, "We considered calling everybody that [the Petitioner] told us about, but we didn't call them because what they told us they would testify to would not be beneficial or helpful." Trial Counsel did not specifically recall whether he interviewed the witnesses the Petitioner alleges that he should have called. Regarding an alibi witness, Trial Counsel recalled, "[W]e were begging for an alibi. . . . [W]e couldn't come up with anything." He testified that if there had been an alibi witness, the defense team would have found him or her.

Trial Counsel testified that he requested a change of venue for the trial, but did not request the jury be sequestered because "[n]obody on the jury had ever heard of [the case]." He explained, "[I]t might have been high profile in Warren County, but [in] Putnam, it wasn't interesting." Further, he recalled that the jury was "admonished every evening or every break and then they were questioned when they came back in after every break or overnight." Trial Counsel also stated, "I felt very comfortable with them and I felt we were better off quite frankly because they were comfortable, they were staying at home as opposed to some motel down here and not seeing their families. I thought it was to our advantage." Finally, he said that, because they were not sequestered, the jurors were rested and paid better attention.

Regarding the Petitioner's sentencing hearing, Trial Counsel testified that, in hindsight, he wished that the Petitioner had not testified. However, other than that, he said that he would not have done anything differently during the hearing.

Mr. Lax testified that he has been a private investigator since October 1971, and had worked on 300 capital cases and about 800 or 900 murder cases. He said that he began working on the Petitioner's case about a year to a year-and-a-half before the trial and put

hundreds of hours of work into the case. He testified that mitigation specialist Julie Hackenmiller and guilt/innocence investigator LeeAnn Huggins worked on the Petitioner's case as well. He recalled that he reviewed all potential witnesses with the Petitioner.

Mr. Lax testified that he remembered going to Teresa Pelham's house and that she was interviewed, however, he could not remember who interviewed her. He testified that he could not remember if she provided any useful information. Mr. Lax testified that he thought he spoke to Shonda Myers, but that he could not recall what she said.

He also testified that he remembered there being a "rumor" that there was a videotape showing the Petitioner at a Phillips 66 Station in McMinnville around 5:45 a.m. on the morning of the murders. He further said, "I know that we went to the Philips service station, I know we talked to several of the employees and we tried to find a video tape and were unsuccessful." He added, "I also know at the time that General Potter had open file discovery and was very good about providing us with anything and everything that he had." Regarding what he did to investigate a possible alibi for the Petitioner, Mr. Lax testified as follows:

> We talked to people that he told us that he would have been around. We talked to people at the service station. There were neighbors that we talked to trying to show if anybody recalled that he was either at home or if they had seen him at other places. We tried to determine if there were other individuals who were in and around the victim's home at the time.

Mr. Lax also stated, "I don't recall we found anything that would have substantiated an alibi that we could have introduced."

Mr. Lax testified that he investigated a vehicle that was seen in the area of the murders and that he believed he "finally traced it to a neighbor's, a visitor to a neighbor's house." However, he could not recall if the car was a black Nova.

When asked if he could have done anything differently on the case, Mr. Lax said, "[I]n hindsight you always think you could go back and knocked on an extra door, done something. But at the time we felt we had spoken with everyone we could conceive of that could help."

The Petitioner testified that Twila Kay Conrad should have been called as a witness to show prosecutorial misconduct, specifically that the District Attorney created evidence that was used against him at trial and that the District Attorney was engaged in an affair with one of the State's key witnesses against the Petitioner. The Petitioner stated that he knew all of

this because he received a copy of a letter Ms. Conrad wrote to Felicia Smith, who gave the letter to Doug Myers, who sent a copy to the Petitioner. He testified that he gave the letter to Mr. Lax or Trial Counsel before the trial.

The Petitioner also stated that his trial counsel should have presented the testimony of a fellow prison inmate who told the Petitioner that a woman told him "she was at the house in a car with other people the morning of the murder." He also testified that Jo Snider should have testified about a black Nova that she saw on the side of the road with a flat tire.

Regarding sequestration of the jury, the Petitioner acknowledged that he was aware that he could have had the jury sequestered if he wanted. He also testified that Trial Counsel said he thought it was best not to sequester the jury and that he "went with [Trial Counsel]." Further, the Petitioner acknowledged that, at the time, it was a tactical decision.

The post-conviction court denied the Petitioner's petition for post-conviction relief, finding that none of the issues he raised had merit. The Petitioner now appeals.

## Analysis

To sustain a petition for post-conviction relief, a petitioner must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not reweigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The post-conviction judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

## I. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

### A. Jury Sequestration

The Petitioner asserts that Trial Counsel provided ineffective assistance of counsel by failing to ensure that the jury was sequestered during the trial, and therefore, there was an "opportunity for jury tampering or improper outside influence." After hearing the proof and arguments, the post-conviction court stated that the Petitioner did not show that there was a reason for the jury to be sequestered and added, "He is in a different county, trying his case with a jury that knows nothing about the proof or witnesses, as has been shown today, [Trial

Counsel] testified to that. And so that regarding a constitutional issue or any type of ineffective assistance of counsel fails also."

We agree with the post-conviction court that the proof tendered at the post-conviction hearing did not demonstrate that Trial Counsel was deficient in his representation of the Petitioner by choosing not to request that the jury be sequestered. Trial Counsel testified that he secured a change of venue and, once the trial was moved to Putnam County, he was not worried about sequestering the jury because "[n]obody on the jury had ever heard of [the case]." Trial Counsel also testified that the jury was admonished at every break not to discuss the case and that they were questioned when they came back into the courtroom. Further, Trial Counsel testified that it was a tactical matter that he did not ask to sequester the jury, noting that he thought they would be more comfortable staying at home, rather than a motel, and that they would be more rested and pay better attention. The Petitioner even acknowledged that he "went with" Trial Counsel's suggestion and that it was a tactical decision. Moreover, although the Petitioner's brief contends there was an "opportunity for jury tampering or improper outside influence," he presented no evidence that the result of the trial would have been different had the jury been sequestered. The Petitioner is not entitled to relief on this issue.

### B. Interviewing and Presenting Witnesses

The Petitioner contends that Trial Counsel "was ineffective for fail[ing] to interview and present known witnesses at trial which were favorable to the defense and would have impeached the [S]tate's key witnesses, and created an alibi defense." The post-conviction court stated that the proof presented at the hearing showed the Petitioner "received all of the requests that were made by him through his attorney for expert services [and] investigative services." The post-conviction court further noted that, although the Petitioner claimed certain witnesses should have been presented at his trial, none of the witnesses were presented at the post-conviction hearing.

In Black v. State, this Court stated, "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In his amended post-conviction petition, the Petitioner mentions thirty-two witnesses, and what their purported testimony would be, however, none of them testified at the post-conviction hearing.[2] Thus, the Petitioner has failed to demonstrate that the result of the trial would have been different had other witnesses testified.

_____

[2] We note that four of the witnesses he said should have been presented at his trial *did* testify, for the defense, at his trial—Teresa Pelham, Gary Cherry, Jo Snider, and Steve Sliger.

Moreover, we cannot conclude that Trial Counsel was deficient. The Petitioner had a defense team that included an investigator, mitigation specialist, and guilt/innocence specialist. Mr. Lax, decsribed by Trial Counsel as one of the best investigators in the country, testified that he worked hundreds of hours on the Petitioner's case. Trial Counsel testified that if there had been an alibi witness, the defense team would have found him or her. Mr. Lax testified that he spoke to people at the gas station the Petitioner said he went to on the morning of the murders, but that he was not able to find an alibi witness. He also stated, "I don't recall we found anything that would have substantiated an alibi that we could have introduced." Trial Counsel testified, "Every name that [the Petitioner] gave me or Mr. Lax . . . we searched for diligently and discussed and investigated thoroughly." He later elaborated, "We considered calling everybody that [the Petitioner] told us about, but we didn't call them because what they told us they would testify to would not be beneficial or helpful." The Petitioner is not entitled to relief on this issue.

## C. Sentencing enhancement factors

In setting the Petitioner's sentence at twenty years for each count of facilitation of second degree murder, the trial court applied the following enhancement factors: (1) The Petitioner had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (4) A victim of the offense was particularly vulnerable because of age or physical or mental disability; (5) The Petitioner treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense; (8) The Petitioner, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and (13) At the time the felony was committed, the Petitioner was on parole. See Tenn. Code Ann. § 40-35-114(1), (4), (5), (8), (13). To arrive at a sentence of twenty-five years for the Petitioner's aggravated arson conviction, the trial court applied all of enhancement factors mentioned above, as well as: (2) The Petitioner was a leader in the commission of an offense involving two or more criminal actors; and (3) The offense involved more than one victim. See Tenn. Code Ann. § 40-35-114(2), (3).

The Petitioner asserts that his trial "[c]ounsel was ineffective for failing to object to the trial judge's use of certain enhancement factors to increase his sentence beyond that authorized by the jury's verdict[,] [t]hus denying [his] Sixth Amendment right to trial by jury." In his brief, the Petitioner cites the following United States Supreme Court cases to support his argument: Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), and Cunningham v. California, 549 U.S. 270 (2007). The State argues that because Blakely and Cunningham had not been decided when the Petitioner was sentenced, on October 22, 2001, the Petitioner cannot contend that his trial counsel was deficient for not arguing law that did not yet exist. However, the State presents no argument

regarding the application of Apprendi, which, as the Petitioner correctly points out in his reply brief, had been decided at the time of his sentencing hearing.

In Apprendi, the defendant pleaded guilty to an offense with a possible prison sentence of between five and ten years. 530 U.S. at 469-70. After the plea, but before sentencing, the State filed a motion for an extended sentence based on a hate-crime statute. Id. at 470. After a hearing, the trial court applied the hate-crime sentence enhancement and sentenced the defendant to twelve years of imprisonment. Id. at 471. However, the United States Supreme Court struck down the statute and held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.

The defendant in Blakely pleaded guilty to a crime in which "[t]he facts admitted in his plea, standing alone, supported a maximum sentence of 53 months. Pursuant to state law, the court imposed an 'exceptional' sentence of 90 months after making a judicial determination that he had acted with 'deliberate cruelty.'" 542 U.S. at 298. The United States Supreme Court applied the holding of Apprendi and struck down the sentence. Id. at 305. The Court also explained that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Id. a 303-04.

In Cunningham, the defendant was convicted of a crime that was "punishable by imprisonment for a lower term sentence of 6 years, a middle term sentence of 12 years, or an upper term sentence of 16 years." 549 U.S. at 275. California's sentencing law "obliged the trial judge to sentence Cunningham to the 12-year middle term unless the judge found one or more additional facts in aggravation." Id. After a hearing, the trial court found six aggravating circumstances, but only one mitigating factor, and sentenced the defendant to the upper term of sixteen years. Id. at 275-76. The Supreme Court noted that, as explained in Blakely, the middle term of twelve years was the "statutory maximum" and was the longest term the judge could impose. Id. at 288.

The issue we are presented with in the instant appeal is whether, on October 22, 2001, Petitioner's trial counsel was deficient for not arguing that Apprendi prohibited the trial court from applying enhancement factors, other than those based on the Petitioner's prior convictions, when determining his sentence. Initially, we note that the Petitioner presented no evidence regarding trial counsel's alleged deficiency during the post-conviction hearing, nor was Trial Counsel asked to explain his understanding of Apprendi at the time of the Petitioner's sentencing. Nonetheless, an examination of the holding of Apprendi leads us to conclude that Trial Counsel cannot be found deficient for failing to raise this issue at the Petitioner's sentencing hearing.

In Apprendi, the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. It was not until Blakely and Cunningham that the Supreme Court explained what it meant by the "statutory maximum" sentence that Apprendi referred to. In Apprendi, the defendant pleaded guilty a crime that was punishable by five to ten years in prison. Id. at 469-70. However, he received an enhanced sentence of twelve years based on the application of a hate-crime statute. Id. at 471. Given the facts of Apprendi, it would be reasonable to conclude that when the Court referred to a "statutory maximum," it was referring to the ten years of possible incarceration for the crime to which the defendant pleaded guilty. In fact, our supreme court interpreted Apprendi in just that way.

In 1991, Thomas Eugene Graham was convicted of aggravated rape, a Class A felony, aggravated kidnapping, a Class A felony, and aggravated burglary, a Class C felony. See State v. Thomas Eugene Graham, No. 03C01-9112-CR-00391, 1993 WL 218264, at *1 (Tenn. Crim. App., Knoxville, June 22, 1993). Graham was given the maximum Range I sentences for each offense—twenty-five years for the Class A felonies and six years for the Class C felony. Id. In 2002, the Tennessee Supreme Court examined Graham's case after lower courts had denied his motion to reopen a previous petition for post-conviction relief. See Graham v. State, 90 S.W.3d 687, 688-89 (Tenn. 2002). Our supreme court examined whether the maximum sentences imposed by the trial court, after it made a "finding of several enhancement factors," violated Apprendi because the enhancement factors had not been found by a jury beyond a reasonable doubt. See id. at 691-92. Our supreme court held that because Graham "received a sentence *within* the statutory maximum for each crime[,] . . . the trial court was well within its constitutional and statutory authority to consider enhancing factors for the purpose of sentencing without the assistance of the jury." Id. at 692 (emphasis in original). Given that, before Blakely and Cunningham, the Tennessee Supreme Court interpreted Apprendi in such a way that precludes a finding that the Petitioner's trial counsel was deficient in failing to raise the issue, we conclude that the Petitioner is not entitled to relief on this issue.

### D. Confrontation Clause

During the Petitioner's trial, the trial court allowed several witnesses to testify about statements made by Clementine Myers, a co-defendant. Before allowing the statements, the trial court held a jury-out hearing and found that the statements were admissible under Tennessee Rule of Evidence 803 (1.2)(E) because they were statements of a co-conspirator made during the course of and in furtherance of the conspiracy. See Lewis, 2003 WL 22398394, at *5-6 (affirming the judgment of the trial court). Clementine Myers did not testify at the Petitioner's trial, nor did she testify at his post-conviction hearing. In the instant appeal, the Petitioner contends that testimony of statements Clementine Myers made violated

his Sixth Amendment right to confront witnesses and, thus, he claims that Trial Counsel was ineffective because he failed to raise this issue at trial.

At the time of the Petitioner's trial and direct appeal, the law was clear that a defendant's right to confront witnesses under the Sixth Amendment to the United States Constitution, and article I, section 9 of the Tennessee Constitution, was not violated by the admission of a co-conspirator's statements. See State v. Alley, 968 S.W.2d 314, 318 (Tenn. Crim. App. 1997).[3] Therefore, trial counsel was not deficient for failing to object based on the Confrontation Clause to testimony of statements made by a co-conspirator. Accordingly, the Petitioner is not entitled to relief on this issue.

## II. Cumulative Effect of Error

Finally, the Petitioner contends that the cumulative effect of the errors alleged above entitles him to a new trial. Having found no error, however, we conclude that the Petitioner is not entitled to relief.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the denial of post-conviction relief.

_____
DAVID H. WELLES, JUDGE

---

[3] Just as with the sentencing issue previously discussed, we note that the Petitioner's trial took place prior to the date of the filing of the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004).